Messenger Publishing Company v. Commissioner.
Messenger Publ. Co. v. Commissioner
Docket No. 11420.
United States Tax Court
1947 Tax Ct. Memo LEXIS 101; 6 T.C.M. (CCH) 988; T.C.M. (RIA) 47241; August 26, 1947
*101 Joseph R. Royston, Jr., Esq., 1203 Farmers Bank Bldg., Pittsburgh, Pa., for the petitioner. George C. Lea, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: This proceeding involves deficiencies for the years 1941 to 1944, together with petitioner's claims of overpayments, as follows: Over-
Years
Type of Tax
Deficiency
payment
1941
Income
$ 288.73
$1,315.32
1942
Income
401.82
1,471.42
1943
Income
2,025.39
1944
Income
1,283.83
1944
Excess-Profits
2,819.67
Some of the issues having been conceded or abandoned and others subject to disposition under Rule 50 computation, two issues remain: (1) Whether payments on petitioner's outstanding preferred stock are in reality interest and not dividends. (2) Whether petitioner is entitled to deduct as an ordinary and necessary business expense the sum of $500, part payment on an automobile given to a political leader, through whose political influence petitioner received a public adveritising contract. Some of the facts have been stipulated. Findings of Fact The stipulated facts are hereby found accordingly. Petitioner, a Pennsylvania *102 corporation, organized in 1906 for the purpose of printing and publishing a newspaper, filed its tax returns, prepared on a calendar year-accrual basis, with the collector for the twenty-third district of Pennsylvania. Its original authorized capital of 500 shares of $100 par value common stock was increased from time to time until, in 1928, its authorized common stock consisted of 2,500 shares of $100 par value. On January 31, 1929, petitioner received approval to convert its 2,500 common shares of $100 par value into 1,250 shares of preferred stock of a par value of $100 per share and 2,500 shares of no-par-value common stock. The new shares were distributed, one share of preferred and one share of new common for each two shares of old common stock. 1,208 shares of each class were thus issued, leaving 42 shares of preferred and 1,292 shares of new common unissued. It is payments on the preferred shares that are the subject of the dispute under the first issue. The change in stock structure in 1929 was made in order to facilitate the sale of the business, although the deal was never consummated. Negotiations were commenced sometime late in 1928, as a New York syndicate, Bodell *103 and Company, evinced an interest in acquiring petitioner's newspaper. A final purchase price of $275,000 was established; $150,000 in cash and the balance in some form of securities, other than bonds, as the prospective purchaser found it "necessary to have the property free from any bonded indebtedness." To meet this point, petitioner issued the preferred stock, which was subordinate to the claims of creditors. The shares were subject to the following provisions, inter alia: (A) Entitled to annual cumulative dividends of 7 percent out of surplus or net profits. (B) Entitled to receive an amount equal to 110 percent, plus unpaid accumulated dividends, on voluntary or involuntary distribution of capital assets. (C) Redemption on January 1, 1949, at par plus accumulated unpaid dividends, with authority in directors to redeem or retire at an earlier date at 110 percent, plus unpaid accumulated dividends. (D) Establishment of a sinking fund for purposes of acquiring shares of the preferred stock on the open market. (E) Maintenance of the aggregate amount of current net assets at an amount at least equal to 15 percent of the par value of the outstanding preferred stock, and *104 the amount of net tangible assets at an amount equal to 100 percent of the par value of the outstanding preferred stock, with a right to vote if the ratio of assets to preferred stock not maintained. (F) Restriction on the right of common stockholders to authorize any increase of capital stock while any preferred stock was outstanding. (G) Restriction on petitioner's right to execute any mortgage or cause any lien to be placed on its assets unless holders of 75 percent of the amount of outstanding preferred stock give prior consent; except for conversion of preferred stock into bonds. From 1929 to 1943, petitioner treated the payments on the preferred stock as dividends and not as interest, and treated the preferred stock as part of its capital stock structure. In its 1943 tax return petitioner, for the first time, claimed the payments as interest. In 1941 petitioner paid by check $500 to an automobile distributor as part payment on a Chrysler automobile for C. J. McBride, a political leader in Pennsylvania. Through McBride's political influence, which it believed essential, petitioner was granted a public contract for the publication of tax lists of the Mercantile Appraisers *105 Board, a public body of Allegheny County. One of petitioner's officers and directors thought that McBride was a member of that Board. The sum of $500 was expended for the purpose of having McBride exert his political influence with a view towards petitioner's obtaining a public advertising contract. Opinion The present case is indistinguishable from numerous authorities holding the securities in question to be preferred stock and not evidences of debt, and payments made thereon to be a distribution of profits and not deductible as interest on indebtedness. There are the considerations of subordination to creditors, 1432 Broadway Corp., 4 T.C. 1158, affirmed (C.C.A., 2nd Cir.), ; limitation of dividends to surplus or profit, ; a right, however restricted, to vote, ; , affirmed (C.C.A., 9th Cir.), , certiorari denied, ; the significant, though not indeed conclusive, designation selected by petitioner itself for the security, ; *106 and the treatment accorded by petitioner itself on its records and tax returns, . Only the fact that these shares were redeemable with accumulated unpaid dividends at a fixed future date assimilates them in any respect to an indebtedness. But while it may be true that without that virtually indispensable feature no security can ordinarily be considered evidence of a debt. ; cf. , the converse is not true, since "it is not unusual for preferred stock to have a maturity or retirement date." ; see also Nor do the cases principally relied on by it support petitioner's position. In both , and , an intention of the parties was present, found, indeed, with *107 some difficulty, by a divided court in the latter case to create an indebtedness to the vendors in payment for property acquired. If the original intention to sell petitioner's business had been carried out, an analogy of sorts, the compelling extent of which we find it unnecessary to decide, cf. 1432 Broadway Corp., supra, might have arisen. Even so, the entire present record seems to suggest rather a studious effort to avoid a fixed obligation than the reverse. See Simons, J., concurring opinion, But in any event, the purposes of the potential purchaser fade into irrelevance, since whatever was contemplated, only the actuality persists that petitioner's shares remained in the hands of the same holders and continued to represent nothing but their original capital investment, contributed, not as a loan but at the risk of the business. ; We are unable to characterize these securities as anything different from what their creators called them, nor to accede to petitioner's claim to deductibility *108 as interest of the payments thereon. The remaining contested issue requires determination of the allowance as an ordinary and necessary expense of an indirect payment to a political leader, admittedly for the exercise of his influence. Rejection of such deductions as contrary to public policy, and outside the realm of "compensation for actual business services" is by now too well settled to warrant reexamination. ; ; . On both questions in issue the deficiencies are sustained. Because of other items, Decision will be entered under Rule 50.